UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cr-134-DFH-KPF |
| | ) | |
| MICHAEL DOWNEY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION TO SUPPRESS

A grand jury indicted defendant Michael Downey on one count of possession of child pornography.  Downey has moved to suppress evidence obtained from a search of his residence on January 8, 2008, including a search of a laptop computer.  The search was conducted pursuant to a search warrant that was sought and issued only after police officers had entered the residence without a warrant.  Downey argues that the warrant was based on tainted information that the officers obtained by means of an illegal entry.

The court held an evidentiary hearing on July 9, 2009.  Pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the court now states its findings of fact and conclusions of law.  As explained below, the court grants the motion to suppress.  The evidence shows that the police officers illegally entered the defendant's residence and relied upon the information they obtained illegally to secure the search warrant.  There were no exigent circumstances that could have

justified the warrantless entry into a private home, nor was the discovery of the evidence at issue inevitable apart from the illegal entry.

*Findings of Fact*

In November 2007, the FBI's Indianapolis office contacted the Hamilton County Internet Crimes Against Children Task Force (the task force) with a lead about a person who might have possessed child pornography in Carmel.  Back in January or February 2007, the FBI had searched a California computer and discovered that the computer used the Google Hello program to send images of child pornography to a person using the screen name "akriel."  Google subscriber information and other investigation indicated that "akriel" was using an internet connection registered to Michael Downey at an apartment address in Carmel, Indiana.

On December 4, 2007, task force detectives obtained from an Indiana state court a search warrant for the Carmel apartment.  The warrant referred to the Carmel apartment but did not mention Michael Downey by name.  Gov't Ex. 4. Task force detectives attempted to serve the warrant on December 6, 2007.  They learned that Michael Downey no longer lived at the apartment, so they did not serve the warrant.  Task force detectives spoke with people at Downey's former employer (student loan administrator Sallie Mae), and learned that he had left the United States to work for the Peace Corps in Africa but that he might have

returned recently to the United States.   A Sallie Mae employee also told the detectives that Downey was adept with computers and would be able to hide or encrypt information on a computer.

Database searches eventually linked Downey with a business called Grief Healing, Incorporated, with an address on 79th Street in Indianapolis.   The business is owned and run by Downey's step-father and mother, Dr. Kenneth Reed and Sandra Reed.   On January 8, 2008, task force Detective Dan Claassen called the telephone number associated with the business and asked for Downey. Dr. Reed answered and told Claassen that Downey was sleeping.   Claassen told Dr. Reed that he was a Fishers police officer and falsely said that he wanted to speak with Downey about a personnel matter related to Sallie Mae.   Claassen asked Dr. Reed to have Downey return his call, and Dr. Reed agreed to do so.   At 11:09 a.m., Downey used his cell phone to return Claassen's call.   Claassen again said that he wanted to speak about a Sallie Mae personnel matter. Downey told Claassen that he would call him back to arrange a location where they could meet. Two hours later, at approximately 1 p.m., Claassen called Downey again.   Downey then told Claassen that he did not want to speak to him about the personnel issue.

Claassen then traveled to the 79th Street address with two other members of the task force, Detective John Pirics and Detective Mike Widner.   At about 1:30 p.m., they arrived at the address, which is a single-family residence.

Claassen knocked on the front door.  Claassen and the other detectives were dressed casually, and their clothes covered their service weapons.  Pirics and Widner were standing several feet behind Claasen.  Dr. Reed answered the door. Claassen identified himself as a Fishers Police Department detective.  At the door, Claassen was facing north.  The living room of the home was to Claassen's right or east as he stood facing the front door.

Evidence as to what Claassen saw from the front door and what happened at the front door was sharply disputed.  Claassen testified that from the door, he saw Downey, whom he recognized from a driver's license photograph, at the far (east) end of a living room couch operating a white Apple laptop computer.  He testified that he saw Downey close the cover of the laptop with his foot.  On cross-examination, Claassen made it clear that he saw all of this while he was still outside the threshold of the entrance.  Dr. Reed testified that it would have been impossible for a person outside the threshold of the front door to see the east end of the couch.  A somewhat dated blueprint of the house provided by Dr. Reed corroborates his testimony, even allowing for minor changes in the house since the blueprint was prepared.  Def. Ex. 1.  The blueprint shows that it is highly unlikely that a person standing where Claassen said he was standing outside of the front door threshold could have seen someone sitting at the east end of the couch in the living room.  It would have been impossible for Claassen to have seen the east end of the coffee table in the living room, where Downey allegedly closed the laptop with his foot.  See Def. Ex. 1; Gov't Ex. 9 (photograph of layout of living

room on January 8, 2008, taken from inside the front door).  The court finds Dr. Reed to be more credible on this issue.  From outside the front door, Claassen could not have seen Downey using a computer or closing it with his foot.

Downey approached the front door and told Dr. Reed in agitated and loud tones that he did not need to let the police enter the house unless they had a warrant.  Dr. Reed remained calm while Claassen was at the door.  Claassen told Dr. Reed that even if Downey would not speak to him, he would like to speak to Dr. Reed and his wife.  Claassen testified that he told Dr. Reed that he had information that Dr. Reed and his wife would want to know.  Dr. Reed testified that Claassen told him that he wanted to talk to him about a matter of his and his wife's "personal safety."  Dr. Reed's wife is Sandra Reed, Downey's mother.  Mrs. Reed testified that when she came to the door, Claassen told her that he wanted to speak with her about a matter of her "personal safety."  The court finds the Reeds to be more credible on this issue.  There was no issue of personal safety, but that lie was how Claassen convinced the Reeds not to demand that he leave immediately.

Claassen testified that Dr. Reed stepped back from the door and opened it wider, which Claassen said he interpreted as a silent invitation to come into the house.  Dr. Reed testified that he did not act in a manner that suggested Claassen could enter and that Claassen just brushed him aside and entered the house when Mrs. Reed approached the door, pointing at her and saying "She's the one

I want to talk to," or words to that effect.  The court finds Dr. Reed more credible on this matter, as well.  Dr. Reed testified persuasively that he did not intend to let the officers in and that he did not act in a manner that welcomed Claassen into the house while his step-son was saying forcefully that he did not have to let the police in and that he should not let them in.  In other words, Claassen and the other detectives entered the house without a warrant and without the consent of the residents.

Detective Claassen entered the house, and he went into the kitchen. Detectives Pirics and Widner entered the kitchen as well.  After the officers had entered the home, Dr. and Mrs. Reed agreed to speak with them.  Claassen sat at the kitchen table with the Reeds.  Downey retrieved the computer from the living room, unplugged a USB attachment from the computer, and carried the computer close to his chest into the kitchen.  He then walked to an adjacent room, placed the computer in the room, and returned to the kitchen.  He stood in the kitchen while Claassen spoke with the Reeds.  Downey continued to tell the officers that he did not want them in the house.

After five to ten minutes of conversation, Claassen told Dr. and Mrs. Reed that he came to the house not to discuss a Sallie Mae personnel matter but to investigate Downey's possible possession of child pornography.  Mrs. Reed asked Claassen why they should believe what he was saying after Claassen had lied to them about investigating a Sallie Mae personnel issue.  Claassen told Mrs. Reed

that he had a file with information about the investigation of Downey.  He moved to sit next to Mrs. Reed, and he placed the file in front of her.  Mrs. Reed briefly looked at a few pages of the file, which contained some of the child pornography images that were the subject of the investigation.  She was bothered by what she saw, and she handed the file back to Claassen.  At some point, she told Claassen that Downey had purchased the white Apple laptop before he left to work for the Peace Corps in 2007.

Either Dr. or Mrs. Reed asked Claassen if they could speak to Downey in private.  Claassen agreed that they could do so.  Downey and the Reeds went to an upstairs room.  Downey carried the computer to the room, and the door was closed.  At this point, Claassen called Fishers Police Sergeant Andy Setmeyer, relayed some of the new information he had learned in the Reed/Downey home, and asked him to go to the county seat to meet a prosecutor and obtain a search warrant for the house.  After five or ten minutes, Claassen called upstairs to Dr. Reed that he was uncomfortable with the computer out of his sight.  The door was opened.  Claassen climbed partway up the stairs and could see in the room where Downey and the Reeds were talking.  Claassen saw Downey place the computer behind his back.  Mrs. Reed took the computer from Downey, walked down several steps, and held it while she talked to Claassen.[1]  Mrs. Reed told Claassen that

---

[1]Claassen testified that Mrs. Reed told him that she believed the computer contained illegal files.  Mrs. Reed testified that she did not make this statement to Claassen.  This alleged information was not relayed to the state court that issued the search warrant, and this factual dispute is not material to the court's (continued...)

Downey had lived alone in his Carmel apartment.  Claassen called Sgt. Setmeyer again and told him that Downey had lived alone in Carmel and that he purchased his laptop before leaving to work for the Peace Corps.  Mrs. Reed also told Claassen that the laptop was *not* the same one that Downey had owned back in January or February 2007 (the time critical to issuance of the first search warrant) several months before he left for the Peace Corps.  Claassen did not relay that key information to Setmeyer, which would have weakened the case for a new search warrant.

Downey indicated that he wanted to talk to an attorney.  Claassen told Downey and the Reeds that they should consider speaking to an attorney, even going so far as to recommend a particular law firm in Hamilton County.  After several telephone calls, Mrs. Reed and Downey eventually were on the telephone together with attorney Carl Hadley (who is not with the firm Claassen recommended).  They told Hadley about the situation.  Hadley told them that the officers had no right to be in the house and that they should tell the officers to leave.  While Hadley was still on the telephone, Mrs. Reed and Downey both ordered the officers to leave the house, loudly enough so that Hadley could hear them.  Claassen refused and said that the officers would not leave the house alone, leaving Downey and the Reeds in the house, while they waited to see if the court would issue a search warrant.  Claassen suggested that they could all leave

---

[1](...continued)
decision on the motion to suppress.  The court makes no finding on the issue.

the house together or that Downey and the Reeds could leave while the officers waited for a search warrant.  At about this time, Claassen started a digital audio recording that lasted about 26 minutes.  That recording does not reflect yelling or loud voices.  It recorded a tense and difficult conversation as the police officers refused to leave the home when the residents were ordering them to leave.

Hamilton County deputy prosecutor Jeffrey Wehmueller and Sergeant Setmeyer applied to obtain a search warrant for the house from Hamilton Circuit Judge Judith Proffitt.  Gov't Ex. 1.  At the search warrant hearing, Setmeyer submitted to the court the probable cause affidavit that Claassen had submitted in November 2007 to obtain the search warrant for the apartment where Downey had lived in Carmel.  Setmeyer also relayed to the court the information that Claassen claimed he had obtained from his visit to the house:  that he saw Downey close the computer with his foot, that Downey clutched the computer close to his body, that Downey had purchased the computer before leaving to work for the Peace Corps, and that Downey had lived alone at the Carmel apartment. Gov't Ex. 1 at 10-11.  Setmeyer told the judge that Mrs. Reed had told Claassen that the Apple laptop was the only computer she had seen him with, *id.* at 11, but that information was not corroborated by Claassen or Mrs. Reed in their testimony.[2]

---

[2]Claassen testified on cross-examination that he had no way of knowing whether the laptop was the same computer that had allegedly received child pornography nearly a year earlier.  Setmeyer told the judge that "the detective believes that the computer that Mr. Downey is clutching to his bosom so strongly (continued...)

Based on the information presented, the court issued a search warrant for the 79th Street house.  When Claassen learned that the judge had issued the search warrant, he told Downey and the Reeds that they needed to leave the house while the officers conducted the search.  Gov't Ex. 6 at 8.  (This news is reflected on the recording.)  Downey and the Reeds left, and Claassen and the other officers searched the house, including Downey's computer.  That search turned up evidence that is the subject of the current prosecution.

Because this decision turns on issues of credibility, the court should say a little more about the reasons for the credibility determinations.  Dr. Reed was a highly credible witness.  Dr. Reed is a retired minister and psychologist.  For many years, he was a vice president of Methodist Hospital (now part of Clarian Health Partners) in Indianapolis in charge of values, ethics, social responsibility, and pastoral services.  He remained calm and observant during a highly stressful situation.  He corroborated his testimony about what can be seen from the front door with physical evidence from the blueprint and photographs.  He testified confidently and in detail about key details about the interaction with Detective Claassen.  The court saw no sign that he was exaggerating or embellishing his memory of the events.

---

[2](...continued)
is the computer that received the emails referred to" in the probable cause affidavit for the November 2007 search warrant.  Gov't Ex. 1 at 11.

Mrs. Reed was also highly credible.  Before retiring, she worked for fifteen years as the office manager of the counseling and pastoral education department at Methodist Hospital.  She is fairly familiar with police work and practices; her two brothers were career police officers.  She was naturally inclined to believe and want to cooperate with police officers, but she also had a good sense of what the officers were and were not allowed to do without a warrant.  She also found this situation stressful, but again, the court saw no sign that she was exaggerating or embellishing her memory.  The court believes the testimony of Dr. and Mrs. Reed was more credible than the testimony of Detective Claassen on key factual details: what Claassen could have seen from the threshold of the door (as opposed to inside the door), what Claassen said to convince the Reeds to talk with him, whether Claassen was invited into the home or barged in without the Reeds' or Downey's consent, and what Mrs. Reed said to Claassen about how long Downey had owned the Apple laptop.

*Conclusions of Law*

The parties present three legal issues to the court.  The first is whether the initial warrantless entry into the house was justified by a combination of probable cause and exigent circumstances.  The court concludes it was not.  The second issue is whether the "inevitable discovery" doctrine bars suppression even though the initial entry was illegal.  The court concludes that the inevitable discovery doctrine does not apply.  The third issue is whether the search of the computer pursuant to a warrant falls under the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984).  The court concludes it does not.  The court therefore grants the motion to suppress.

I.     *Probable Cause and Exigent Circumstances*

"The Fourth Amendment prohibits a police officer from making an unreasonable entry into a house, and an officer's warrantless entry into a house is presumed to be unreasonable."  *United States v. Venters*, 539 F.3d 801, 806 (7th Cir. 2008) (internal citations omitted).  A warrantless entry into a home may be constitutional if the police obtain consent to enter from a person with authority to give consent.    *United States v. Matlock*, 415 U.S. 164, 170-71 (1974); *United States v. Henderson*, 536 F.3d 776, 779 (7th Cir. 2008).  As a matter of fact, the court has found there was no consent in this case.

A warrantless entry also can be lawful if it is supported by probable cause and exigent circumstances. *Venters*, 539 F.3d at 806-07.  In this case, however, the officers' warrantless entry into the Reed/Downey home was not supported by either probable cause or exigent circumstances, let alone the required combination of both.

The officers did not have probable cause to support the entry.  The government correctly points out that probable cause can be based on a plain-view observation.  However, Claassen and the other officers did not make any observations to give them probable cause that the house contained child pornography before they entered.  When they stood at the threshold of the Reed/Downey home, the officers had at best probable cause to believe that someone using the name Michael Downey had downloaded child pornography a year earlier to a computer at his Carmel apartment.  They also had reason to believe that he was currently staying  at the 79th Street home, after having been out of the country for a stint in the Peace Corps.  That information was not sufficient to give them probable cause to believe that the 79th Street home contained child pornography on January 8, 2008.

Exigent circumstances also were not present.  Exigent circumstances exist when "the police have an objective and reasonable fear that evidence is about to be destroyed." *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998), quoting *United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir. 1987).  The

question is whether "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Marshall*, 157 F.3d at 482, quoting *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989).

The government argues, and Claassen testified, that computer data can be compromised easily. The government also argues that once Downey knew that officers were investigating him, he had reason to attempt to compromise data on his computer. But Downey did not know he was the target of an investigation until after the officers had entered the 79th Street home. It does not follow from the government's two points that the warrantless entry into the house could be justified by exigent circumstances. The warrant requirement would be meaningless if a suspect's mere knowledge that police were investigating him and were present at his home were sufficient to create an exigent circumstance justifying a warrantless entry. Many types of evidence can be destroyed easily: drugs can be burned or flushed down a toilet, biological evidence can be destroyed with chemicals or fire, and computer data can be compromised through high-tech and low-tech means.

On the facts shown here, the government's exigent circumstances argument presents a classic case of an exigency created by the officers themselves. For Fourth Amendment purposes, that is no exigency at all because it would allow such easy evasion of the warrant requirement. See *United States v. Rosselli*,

506 F.2d 627, 630 (7th Cir. 1974) (Stevens, J.) (affirming suppression of evidence seized after police knocked on door and heard scuffling; although exigency was not "contrived by the agents," it was foreseeable, and recognizing this as exigent circumstance "might lend itself to too easy a by-pass of the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded").

It is important to remember that the detectives had developed very little new information before the warrantless entry of the home. They already had reason to believe that Downey was staying at the house. From outside the threshold, Claassen could not see Downey using a computer or even that he had a computer. The only new information the detectives obtained at the door was that Downey did not want them to enter the home. If an individual's aversion to a warrantless entry of his home provided police officers with legal authority to enter the home, the Fourth Amendment's warrant requirement would become hollow. This is not a case where officers developed critical new information before entering the home (for instance, seeing drugs through an open window) and had reason to believe that the evidence would be destroyed if they did not secure the house immediately. The officers' warrantless entry into the house violated the Fourth Amendment. Unless an exception to the exclusionary rule applies, evidence obtained by virtue

of the illegal entry must be suppressed.  *United States v. McGraw*, — F.3d —, —, 2009 WL 1885464, at *3 (7th Cir. July 2, 2009).[3]

II.     *Inevitable Discovery*

The government argues that even if the entry was illegal, it was inevitable that the officers would have discovered the evidence on the computer.  "Under the inevitable discovery doctrine, illegally obtained evidence that is normally suppressed under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity."  *United States v. Fialk*, 5 F.3d 250, 252 (7th Cir. 1993).

Evidence obtained from the search of Downey's computer would not have been inevitably discovered absent the illegal entry into the home.  As discussed above, the officers had probable cause to believe that Downey had downloaded child pornography at his Carmel apartment a year earlier and to believe that he

---

[3]To show exigent circumstances, the government relies on *United States v. Marshall*, 157 F.3d 477 (7th Cir. 1998), but that case is easily distinguishable and also does not solve the absence of probable cause here.  In *Marshall*, police developed substantial new information after beginning surveillance of a house to investigate narcotics.  They found narcotics on several occupants who left the house.  Some of these individuals were arrested in a manner that made it apparent to the remaining occupants that a narcotics investigation was occurring. The Seventh Circuit found that these legitimate arrests of others both bolstered probable cause to search the house and created exigent circumstances that justified the warrantless entry into the house.  In Downey's case, the officers developed no new information before they entered the house.  And at that time, they had no indication that Downey was preparing to destroy or distribute any contraband.

was currently staying at the 79th Street home after his work in the Peace Corps. They had no information about Downey's use of computers at the 79th Street home.  It is certainly not inevitable that the officers would have been able to obtain a warrant based on the very stale information about a different location that was available to them before the illegal entry into the home.

To ensure that the inevitable discovery doctrine does not nullify the warrant requirement by permitting officers to conduct a warrantless search based on only probable cause, the Seventh Circuit requires the government to show that "a warrant would certainly, and not merely probably, have been issued had it been applied for."  *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (finding discovery would have been inevitable where police were lawfully in apartment and plain view showed presence of cocaine; search warrant "certainly" would have issued for search of bags and other containers).  In this case, the evidence shows that the detectives obtained the new warrant by relying on information they obtained by entering the house illegally.  Gov't Ex. 1 at 10-11.  It is not at all certain that the officers could have obtained a search warrant without evidence that they obtained after they entered the home, so the inevitable discovery doctrine does not apply.

III.    *Good Faith Exception*

Despite the illegal initial entry, the officers did obtain a search warrant, and they searched the computer pursuant to that warrant.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established that evidence seized by police officers relying in good faith on a search warrant need not be suppressed as evidence in a criminal prosecution.  "A facially valid search warrant issued by a neutral, detached magistrate will be upheld if the police relied on the warrant in good faith."  *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005).  But nothing in *Leon* suggested that the good faith exception would apply where officers used information that was clearly obtained illegally to procure the search warrant. In fact, the point of *Leon* was to protect law enforcement from legal errors *by the judge* who issues a search warrant, not to provide a new route for avoiding the warrant requirement.  See *Leon*, 468 U.S. at 916 ("The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. . . .  We discern no basis . . . for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.").

Downey argues here for a straight-forward application of the fruit-of-the-poisonous-tree doctrine.  See *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963); *United States v. Patino*, 830 F.2d 1413, 1418 (7th Cir. 1987) (reversing denial of motion to suppress where police entered and searched home illegally,

and search led to confession that was fruit of the poisonous tree).  The doctrine is designed to protect the core constitutional protections of the Fourth Amendment by preventing law enforcement from taking advantage of violations of Fourth Amendment rights.  Allowing police officers to use information they obtain by violating the Fourth Amendment to obtain a search warrant, and then to rely on the warrant and the good faith exception, would create an enormous loophole that would put the privacy rights of all Americans at risk.  Police would be free to push their way into a home over the objections of the residents, look around, question the occupants, and then call in their findings to colleagues who would only then obtain a search warrant.

The Seventh Circuit has said that the exclusionary rule prohibits the introduction of evidence obtained from a search warrant that was based on illegally-obtained information.  *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991), citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-92 (1920), and *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir. 1989).  The Second, Ninth, and Eleventh Circuits have similarly concluded that *Leon* does not apply in such cases.  See *United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005) (reversing denial of motion to suppress where police obtained search warrant by using information obtained from illegal warrantless entry into home); *United States v. Reilly*, 76 F.3d 1271, 1280-82 (2d Cir. 1996) (affirming suppression of evidence obtained with search warrant that was based on information obtained in illegal search of curtilage of home and suggesting that

evidence obtained from a search warrant based on illegally-obtained evidence should always be excluded); *United States v. Wanless*, 882 at 1466-67 (reversing denial of motion to suppress where police obtained search warrant by using information obtained from illegal searches of vehicles).  The reasoning of these cases is sound.

The First, Sixth, and Eighth Circuits have applied the good faith exception in narrow circumstances where police officers could reasonably have thought they were acting lawfully when they obtained the unlawful evidence that was used to secure the search warrant.  See *United States v. McClain*, 444 F.3d 556, 565-66 (6th Cir. 2005) (reversing suppression when officers did not know they were violating Fourth Amendment with initial warrantless search); *United States v. Diehl*, 276 F.3d 32, 43-44 (1st Cir. 2002) (affirming denial of suppression of evidence obtained pursuant to a warrant when officer used information obtained from an illegal entry onto curtilage to procure warrant because officer made an "inadvertent mistake" when he entered curtilage illegally); *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996); *United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991).  It is difficult to reconcile these cases with *Leon* itself, which created the good faith exception to the exclusionary rule because exclusion would not deter police misconduct where the police had done everything right and a judge made a mistake.  The reasoning of these cases seems to follow not *Leon* but the rationale of the qualified immunity defense to personal civil liability under 42 U.S.C. § 1983.  See Craig M. Bradley, *The "Good Faith Exception" Cases:*

*Reasonable Exercises in Futility*, 60 Ind. L. J. 287, 302 (1985) (*Leon* does not apply to use of evidence obtained illegally without a warrant); 1 Wayne R. LaFave, Search & Seizure § 1.3(f) (4th ed. 2008) ("when the warrant-issuing process leaves totally unresolved the lawfulness of the prior police activity, then there is no reason why that process should, via *Leon*, shield that activity from full scrutiny at the suppression hearing").

Even if this latter group of cases is correct, their narrow holdings do not apply here. Detective Claassen could not reasonably have thought he was acting lawfully in entering the Reed/Downey home. Claassen and any reasonable officer should know that a warrantless entry into a house absent consent or a combination of probable cause and exigent circumstances was illegal. Dr. Reed did not give the officers permission to enter the house. Before he entered the house without consent, Claassen did not gain any new information linking Downey to a computer in the house. He should have known that his entry was illegal. The search warrant would not have been obtained without the illegally obtained information. It was not valid, and the fruits of the original illegal entry must be suppressed, including the evidence from the search of Downey's computer. The motion to suppress is granted.

So ordered.

Date: July 21, 2009

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court

Southern District of Indiana

Copies to:

James C. McKinley
INDIANA FEDERAL COMMUNITY DEFENDERS
jim.mckinley@fd.org

Gayle Helart
UNITED STATES ATTORNEY'S OFFICE
gayle.helart@usdoj.gov